UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TIMOTHY PETTUS, JR., <br><br> Plaintiff, <br> v. <br><br> Q3 CONTRACTING, INC., <br> a Minnesota corporation, and <br><br> PRIMORIS SERVICES CORPORATION, a Texas Corporation <br><br> Charles Smith and Charlie Smith in both their individual and official capacities, <br><br> Defendants. | Case No: _____ <br><br> COMPLAINT <br> AND JURY DEMAND |

**COMES NOW** the Plaintiff, Timothy Pettus, Jr., by and through his undersigned counsel, and for his Complaint against Defendant Q3 Contracting, states as follows:

### THE NATURE OF THE ACTION

1. This case arises out of the actions taken by Defendant Q3 Contracting. Inc. (hereinafter "Q3"), the Plaintiff's former employer, where Q3 unlawfully created a racially hostile workplace; unlawfully terminated his employment motivated, in whole or in part, by race in violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981) and unlawfully terminated Plaintiff in violation of public policy.

2. As a result of these actions, Plaintiff was deprived of a working environment free from aggression, was made to suffer racial harassment, and endured threats to his physical

1

wellbeing. Furthermore, Plaintiff has suffered loss of past and future income and benefits; has been made to suffer past and future emotional distress including humiliation, embarrassment and anxiety; and was unlawfully terminated in violation of public policy.

3. Plaintiff therefore brings this action to obtain relief based on claims for violations of 42 U.S.C. § 1981.

**PARTIES**

4. Plaintiff Timothy Pettus, Jr. (hereinafter "Pettus") is a natural person and a resident of Iowa. During the events described herein Plaintiff was working in Polk County and Wapello County, Iowa.

5. Defendant Q3, a construction provider in Natural Gas, Electric Distribution, Telecom, Water and Municipal projects, is a Minnesota Corporation with its principal place of business in Little Canada, MN.

6. Primoris Services Corporation, a holding company and Q3's parent company, is a Delaware Corporation with its principal place of business in Dallas, Texas.

7. Defendant Charles Smith (hereinafter "Charlie") was at all times material to this matter Pettus' supervisor and a resident of Iowa.

8. Defendant Charles Smith ( hereinafter "Chuck") was at all times material to this matter Pettus' supervisor and a resident of Iowa.

**VENUE & JURISDICTION**

9. This Court's federal question jurisdiction and supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises

under the laws of the United States; (ii) the claims brought under the Civil Rights Act of 1866, 42 U.S.C. § 1981 et seq. are civil rights claims; and (iii) the state law claims are so closely related to the federal law claims as to form the same case and controversy under Article III of the U.S. Constitution.

10. The unlawful acts alleged below were committed primarily in and around Polk County and Wapello County, Iowa.

11. This Court has personal jurisdiction over Defendant because it is located, and conducting business, in the State of Iowa.

12. Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district.

### COUNT I: HOSTILE WORK ENVIRONMENT & DISCRIMINATION
### 42 USCS § 1981

13. Pettus repleads the allegations above as if fully set forth herein.

14. Pettus began employment with Defendant on or about July 2019 as a laborer at Defendant's facility in Des Moines.

15. Pettus is a black male.

16. Pettus has a heart condition, atrial fibrillation, an arrhythmia that can lead to blood clots in the heart and increases the risk of stroke, heart failure, and other heart-related complications, such as hypertension, tachycardia, chest tightness, dizziness, and shortness of breath.

17. Since the date of Pettus' employment, he has held the position of laborer.

18. Pettus' duties as a laborer included: digging holes and trenches for gas lines, built gas meters, set risers, backfilled, and operated commercial vehicles hauling equipment.

19. Throughout his employment, Pettus has endured several instances of verbal racial abuse and intimidation.

20. On several occasions, Charlie Smith and Chuck Smith, his supervisors, have referred to Pettus as a "Yard Monkey."

21. Chuck Smith has referred to Pettus as "boy" on several occasions. On one such occasion, he stated, "boy, your ass is going to be in the fuckin' soup kitchen line [sic]."

22. Chuck Smith has also threatened Pettus, stating "it will be your ass if anything else gets damaged [sic]."

23. On another occasion, after Pettus mentioned his heart condition, Charlie Smith stated that if Pettus had a heart attack he would just throw water on him and shock him with jumper cables.

24. Electric shock has been a form of torture and execution used to harm, injure, mutilate, and lynch black, African, and African American people for over 100 years.

25. On another occasion, Chuck Smith unhooked the trailer from a dump truck Pettus was preparing to drive. When Pettus found that the trailer was not attached and confronted Chuck Smith, Chuck Smith stated, "Just making sure you were doing your walk arounds, boy." Were Pettus not to have found that the trailer was unhooked, it would have detached while Pettus was driving placing Pettus and anyone else on the road in imminent danger of severe injury or death.

26.	The concerted pattern of racial harassment that Pettus endured, including the physical threat of torture by electric shock, deprived Pettus of his right to a working environment free from racial abuse and racial discrimination.

27.	As a result of the unlawful racial discrimination subjecting Pettus to a racially hostile work environment and the racially motivated employment termination, Pettus has suffered a loss of past and future wages and benefits and has been made to suffer past and future emotional distress including humiliation, embarrassment and anxiety.

## COUNT II: WRONGUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

28.	Pettus repleads the allegations above as if fully set forth herein.

29.	On or about November 5, 2019, Pettus notified a Human Resources representative that he would likely need some leave in the future, pursuant to the Family Medical Leave Act, due to his heart condition.

30.	On March 18, 2020, the Congress passed, and the President signed into law, the Families First Coronavirus Response Act (hereinafter "FFCRA") in response to the COVID-19 pandemic.

31.	The FFCRA provides "that employees of covered employers are eligible for: two weeks (up to 80 hours) of paid sick leave at the employer's regular rate of pay where the employee is quarantined (pursuant to Federal, state, or local government order or advice of a health care provider)[…]."[1]

---

[1] https://www.dol.gov/agencies/whd/pandemic/ffcra-employee-paid-leave

32. On April 27, 2020, Iowa Governor Kim Reynolds signed a proclamation which stated, in relevant part, "I strongly encourage all vulnerable Iowans, *including those with preexisting medical conditions* and those older than 65, […] to continue to limit their activities outside of their home […]." [emphasis added][2]

33. The Center for Disease Control lists heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension, as conditions in which an individual may be more likely to get severely ill from COVID-19.

34. The Center for Disease Control suggested a period of quarantine for any unvaccinated person that has been in close contact (within 6 feet of someone for a cumulative total of 15 minutes or more over a 24-hour period) with someone who has COVID-19.[3] These guidelines were in place during May 2020.

35. As of May 2020, no vaccine was available for COVID-19.[4] Therefore, Pettus was not fully vaccinated and the Center for Disease Control guidelines for quarantine applied under the circumstances.

36. On or about May 22, 2020, during the onset of the COVID-19 pandemic, Pettus reported to Q3 that he had been exposed to an individual infected with COVID-19 and was seeking a medical diagnosis.

37. On or about May 26, 2020, Pettus was tested for COVID-19 and informed Charlie Smith, the supervising foreman, that he was being tested due to exposure to COVID-19. Pettus received no response from Charlie Smith.

---

[2] https://governor.iowa.gov/press-release/gov-reynolds-signs-new-proclamation-continuing-the-state-public-health-emergency-0
[3] https://www.cdc.gov/coronavirus/2019-ncov/your-health/quarantine-isolation.html
[4] The first COVID-19 vaccines became available in the United States in December 2020.

38. Upon information and belief, at that time, Q3 had put in place COVID-19 protocols which included a requirement that employees quarantine for 14 days if they have come in to contact with an infected individual.

39. On or about May 26, 2020, Pettus followed the company's COVID-19 protocols, as well as the CDC guidelines and Governor Kim Reynolds proclamation, and did not report to work that day.

40. On or about May 27, 2020, Pettus sent a video of his COVID-19 test and a text telling Charlie Smith that he was still awaiting the test results. He received no response.

41. On or about May 28, 2020, Pettus informed Charlie Smith that he was still awaiting the test results. Charlie Smith responded, "Make sure u have the results weather [sic] positive or negative and it has to be the original no copies or fax has to be original that doctors give u thx [sic]."

42. On or about June 1, 2020, the following Monday, Chuck Smith, called Pettus. Pettus informed Chuck Smith that he was still awaiting the test results to which Chuck Smith responded, "Well, you don't have a job anymore." Pettus asked him about the company's mandatory 14-day quarantine policy and Chuck Smith responded that Pettus had not provided the proper notice. Pettus assured him that he had sent the text messages to Charlie Smith, his foreman. Chuck Smith acquiesced that he had seen the text messages but insisted Pettus could have come to work, nonetheless. Chuck Smith then told Pettus that it was Tammy Abdulghani, in Human Resources, who had told Chuck Smith to let Pettus go.

43. On or about June 1, 2020, Pettus contacted the Human Resources office at the Q3 headquarters in Minnesota and was told that there was indeed a mandatory quarantine policy. Pettus also confirmed that the Human Resources office was aware of his heart condition.

44. On or about June 5, 2020, Pettus received his negative COVID-19 test results. Pettus informed a Human Resources manager of the results of the test. Subsequently, Pettus sent copies of the results and text messages related to the quarantine to the Human Resources manager.

45. A few days later, a Human Resources officer called Pettus to inform him that the Des Moines office maintained its position and terminated Pettus.

46. Upon information and belief, Q3 perjuriously and retaliatorily informed the Iowa Department of Labor and Iowa Workforce Development that Pettus had voluntarily quit his position with Q3 thus preventing him from receiving any Unemployment Benefits for approximately two (2) months.

47. Pettus notified his union representative of his termination and the subsequent perjurious notification to Iowa Workforce Development. Representatives of Q3 maintained that Pettus had not properly notified them of Pettus' need for quarantine.

48. Upon information and belief, a Human Resources officer from Q3 subsequently notified Iowa Workforce Development that Pettus had, in fact, not voluntarily quit and that Q3 had not had the correct information when they initially contacted Iowa Workforce Development, stating "Management staff was not told by the foreman [Charlie Smith] of Mr. Pettus' recent exposure to Covid and his 14-day quarantine."

49. Pettus, in following the suggested quarantine guidelines, participated in a protected activity and was terminated for exercising that protected activity.

50. Q3's termination of Pettus because of his participation in a protected activity, quarantining while awaiting COVID-19 test results subsequent to exposure to someone positive with COVID-19, was a termination in violation of public policy.

51. As a result of Defendants' wrongful termination in violation of public policy, Pettus has suffered a loss of past and future wages and benefits and has been made to suffer past and future emotional distress including humiliation, embarrassment and anxiety.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendant Q3 as follows:

(i) On Count I, for violations of 42 U.S.C. § 1981, Plaintiff is entitled to damages in an amounts to be determined at trial for lost wages and benefits, and for past and future damages for emotional distress including humiliation, embarrassment and anxiety, an award from the court for future loss of wages and benefits plus prejudgment interest, and attorneys' fees, fees, costs, and expenses pursuant to the Civil Rights Attorney's Fees Awards Act of 1976 (42 U.S.C. § 1988); and such equitable relief as the court deems fitting and proper, including mandating training and reporting to the court.

As a result of the unlawful racial discrimination subjecting Pettus to a racially hostile work environment and the racially motivated employment termination, Pettus has suffered a loss of past and future wages and benefits and has been made to suffer past and future emotional distress including humiliation, embarrassment and anxiety.

(ii) On Count II, for wrongful discharge in violation of public policy, damages in an amount to be determined at trial, plus prejudgment interest: and

(iii) Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: March 1, 2022

/s/ David H. Goldman_____
David H. Goldman
/s/ Sierra M. Strassberg_____
Sierra Meehan Strassberg
BABICH GOLDMAN, P.C.
501 SW 6th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: sstrassberg@babichgoldman.com

ATTORNEYS FOR PLAINTIFF